UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Petitioner, | ) | |
| | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO. A-13-CV-761 |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX1138, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX3021, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX4555, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX4565, | ) | |
| | ) | |
| 2005 RAYTHEON AIRCRAFT<br>COMPANY HAWKER 800XPi<br>REGISTRATION NO. N824LX<br>SERIAL NO. 258740, AND THE<br>RECORDS RELATED THERETO,<br>INCLUDING BUT NOT LIMITED TO:<br>AIRFRAME AND POWER PLANT<br>APPLIANCE  RECORDS, CURRENT<br>AIRCRAFT INSPECTION STATUS<br>RECORDS, HISTORICAL AIRCRAFT<br>MAINTENANCE RECORDS AND<br>ALL AIRCRAFT LOG BOOKS, | ) | |
| | ) | |
| 2005 RAYTHEON AIRCRAFT<br>COMPANY BEECHCRAFT<br>KING AIR B200, REGISTRATION NO.<br>XA-RDJ; SERIAL NO. BB-1907, AND<br>THE RECORDS  RELATED THERETO,<br>INCLUDING BUT NOT LIMITED TO:<br>AIRFRAME AND POWER PLANT<br>APPLIANCE  RECORDS, CURRENT | ) | |

| | |
|---|---|
| AIRCRAFT INSPECTION STATUS | ) |
| RECORDS, HISTORICAL AIRCRAFT | ) |
| MAINTENANCE RECORDS AND | ) |
| ALL AIRCRAFT LOG BOOKS, | ) |
| | ) |
| Respondents. | ) |

## VERIFIED COMPLAINT FOR FORFEITURE

Comes now Petitioner United States of America, acting by and through the United States Attorney for the Western District of Texas and the undersigned Assistant United States Attorneys, pursuant to Rule G, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Fed. R. Civ. P., and respectfully states as follows:

## I. NATURE OF THE ACTION

1.     This action is brought by the United States of America seeking forfeiture of the following:

Any and all funds in UBS AG, Account Number XXXX1138 in the name of Francisco Colorado Cessa and his wife, Maria Emma Salmon Rocha;

Any and all funds in UBS AG, Account Number XXXX3021 in the name of ADT Petroservicios SA de CV;

Any and all funds in UBS AG, Account Number XXXX4555 in the name of ADT Petroservicios SA de CV;

Any and all funds in UBS AG, Account Number XXXX4565 in the name of ADT Petroservicios SA de CV;

2005 Raytheon Aircraft Company Hawker 800XPi; Registration Number N8224LX; Serial Number 258740, and the records related thereto, to include but not limited to: airframe and power plant appliance records, current aircraft inspection status records, historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport); and,

2005 Raytheon Aircraft Company Beechcraft King Air B200; Registration Number XA-RDJ; Serial Number BB-1907, and the records related thereto, to include but not limited to: airframe and power plant appliance records, current aircraft inspection status records,

historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport),

hereinafter referred to as "Respondent Bank Accounts and Respondent Aircrafts." On June 12, 2012, and August 29, 2012, Francisco Antonio Colorado Cessa and his company ADT Petroservicios, S.A. de C.V., respectively, were designated under the Foreign Narcotics Kingpin Designation Act (Kingpin Act) and as a result all assets of both have been frozen by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC) which include the Respondent Bank Accounts and Respondent Aircrafts.

## II. VIOLATIONS

2.     This is a civil forfeiture action *in rem* brought against the Respondent Bank Accounts and Respondent Aircrafts for violations of Title 18 U.S.C. §§ 1956 and 1957 and Title 21 U.S.C. § 841 subject to forfeiture to the United States of America pursuant to Title 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and Title 21 U.S.C § 881 (a)(6), which state:

**§ 981. Civil Forfeitures**

**(a)(1)** The following property, real or personal, is subject to forfeiture to the United States:

**(A)**   Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957…of this title, or any property traceable to such property.

**(C)**   Any property, real or personal, which constitutes or is derived from proceeds traceable     to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

**§ 881. Forfeitures**

**(a) Subject property**
The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any persons in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter;

## III. JURISDICTION AND VENUE

3.     Under Title 28 U.S.C. § 1345, this Court has jurisdiction over an action commenced by the United States, and under Title 28 U.S.C. § 1355(a), jurisdiction over an action for forfeiture. This Court has *in rem* jurisdiction over the Respondent Bank Accounts and Respondent Aircrafts under Title 28 U.S.C. §§ 1355(b) and 1395. Venue is proper in this district pursuant to Title 28 U.S.C. § 1355(b)(1) because the acts or omission giving rise to the forfeiture occurred in this District.

## IV. FACTS IN SUPPORT OF VIOLATIONS

4.     On December 4, 2012, a Superseding Indictment was returned in the Western District of Texas-Austin Division under cause number A-12-CR-210-SS against MIGUEL ANGEL TREVINO MORALES (1), OSCAR OMAR TREVINO-MORALES (2), JOSE TREVINO-MORALES (3), ZULEMA TREVINO (4), FRANCISCO ANTONIO COLORADO CESSA (6), and fifteen other defendants, charging them with violations of Title 18 U.S.C.§ 1956(h) in the laundering of drug proceeds through the purchase of approximately 485 quarter horses. On May 9, 2013, FRANCISO ANTONIO COLORADO CESSA (6) was found guilty by a jury of Conspiracy to Commit Money Laundering as charged in Count One of the Superseding Indictment. The facts and circumstances contained herein include the same facts and circumstances which gave rise to this criminal case.

## A.     Background:  The Underlying Drug Organization.

5.     *LOS ZETAS* Drug Cartel is a powerful drug organization operating out of Mexico

which funnels thousands of kilos of cocaine into the United States each year. *LOS ZETAS* are the largest drug cartel in Mexico in geographical presence and control eleven states within Mexico. The organization is based in Nuevo Laredo, Tamaulipas, directly across the border from Laredo, Texas. The huge-scale drug trafficking of this organization generates multi-million dollar revenues.

6.      The law enforcement investigation centered on the funneling of drug proceeds from *LOS ZETAS*, MIGUEL ANGEL TREVINO MORALES, a.k.a. "40," (hereinafter "M.TREVINO"), his brother OSCAR OMAR TREVINO MORALES, a.k.a. "42," (hereinafter "O.TREVINO"), and FRANCISCO ANTONIO COLORADO CESSA (hereinafter "CESSA") into the United States. M.TREVINO is the leader of *LOS ZETAS*. One of M.TREVINO's brothers, O.TREVINO, is also integrally involved with him in *LOS ZETAS*. CESSA was a businessman that used drug proceeds from *LOS ZETAS* to get his business, ADT PETROSERVICIOS, S.A. de C.V. (hereinafter "ADT"), up and running and then assisted *LOS ZETAS* in laundering their drug proceeds by using ADT to send money into the United States.

7.      Numbers associated with names were first assigned at the inception of LOS ZETAS to show members' rank within the criminal organization. M.TREVINO and O.TREVINO joined the organization and were assigned numbers 40 and 42. In the last several years, however, killings and captures have eliminated those previously designated as higher ranking members, M.TREVINO has now assumed top leader status. Up until his arrest on July 15, 2013, M.TREVINO had a $5 million bounty for his capture within the United States (as well as million dollar bounties in Mexico) with pending federal drug-trafficking related indictments in the United States. This made it difficult for M.TREVINO to travel freely within the United States or to place assets in his own name. With the capture and arrest of M.TREVINO,

5

O.TREVINO has assumed leadership of *LOS ZETAS*.

8.      M.TREVINO and O.TREVINO utilize another brother living within the United States, JOSE TREVINO MORALES (hereinafter "J.TREVINO"), as well as others to help launder their drug money.  In particular, Mexican businessmen connected to *LOS ZETAS* would purchase the horses, and at some point, the registration of some of these horses would be transferred to J.TREVINO or a company he owned.  This helped legitimize the appearance of their drug money since horse racing is a legal activity and also provided M.TREVINO and O.TREVINO and those working with them, free standing assets that could later be sold or "cashed in."  It also generated legitimate looking income during the intervening time period. The money laundering network of this conspiracy reached from the United States/Mexico border to numerous locations in and near Austin, Texas and elsewhere.

9.      Telephones and other wire communications were utilized extensively by members of the conspiracy to coordinate all aspects of the money laundering to include coordination of purchasing race quarter horses at various auctions and to coordinate the payment of boarding, breeding, training and racing fees.

10.      Under the direction of M.TREVINO and O.TREVINO, *LOS ZETAS* controlled hundreds of miles of Mexican territory along the border of Mexico and the United States, which they used to conduct their drug trafficking and money laundering operations.  *LOS ZETAS* divided their territory into areas known as "plazas" along the Mexico-United States border and assigned each plaza region a leader known as a "plaza boss."  Los Zetas would direct the shipment of cocaine, marijuana, and other controlled substances via boats, planes, and automobiles from Colombia and Venezuela through Central America to various cities and "plazas" in Mexico.  "Plaza bosses" would then transport these shipments of cocaine and

marijuana, as well as other illegal narcotics, via motor vehicles and other means from Mexico to cities in Texas for distribution within Texas and to other cities within the United States. Proceeds from the sale of illegal narcotics in the United States would be transported from the United States to Mexico via bulk cash shipments. These cash shipments would be delivered to the "plaza bosses" for counting and distribution to promote the continuing distribution of illegal narcotics and to launder illegal proceeds through various activities. Included amongst these activities were investments in racing quarter horses purchased via bulk currency payments, wire transfers, checks from businesses established by the organization, structured deposits and bulk currency deposits. The Quarter Horse is an American breed of race horse that is bred to sprint short distances ranging from 220 to 870 yards. Quarter horses are raced primarily in the Southwest United States and California. M.TREVINO and O.TREVINO would direct portions of the bulk cash derived from the sale of illegal narcotics to their brother, J.TREVINO, and others for the purchase, training, breeding, and racing of quarter horses in the United States.

11.  CESSA was one of the Mexican businessmen operating as a straw purchaser for M.TREVINO and O.TREVINO for various horses in the money laundering conspiracy. CESSA controlled ADT, a business entity, which was a front company for *LOS ZETAS'* money laundering activities that was used to conceal and disguise the ownership of quarter horses. CESSA made payments via personal check, checks from businesses established and used by the organization and wire transferred funds for the purchase, boarding, and training of the quarter horses.

**B.  The General Money Laundering Scheme Through the Quarter Horse Industry.**

12.  In January 2010, the Heritage Place Auction House in Oklahoma City, Oklahoma auctioned two quarter horses: Dashin Follies, which brought a winning bid of $875,000 and

Coronita Cartel, which brought a winning bid of $250,000. Shortly after the sale, the Federal Bureau of Investigation (FBI) received information from a confidential source in Mexico that these two horses were purchased by M.TREVINO and O.TREVINO. During the same time frame, the Internal Revenue Service (IRS) was conducting a financial investigation into J.TREVINO and his business, Tremor Enterprises LLC. The two agencies and investigations were merged in February 2011.

13.     M.TREVINO and O.TREVINO would use a number of people to bid on a number of horses at various auctions in California, New Mexico, Oklahoma, and Texas. RAMIRO VILLARREAL, CARLOS NAYEN (hereinafter "NAYEN"), FERNANDO GARCIA (hereinafter "GARCIA"), and others would bid on the horses.[1]

14.     Mexican businessmen, to include RAMIRO VILLARREAL through BASIC ENTERPRISES, ALEJANDRO BARRADAS LAGUNES through GRUPO ADUANERO INTEGRAL AGENCIA ADU, and CESSA through ADT PETROSERVICIOS, ARIAN JAFF, QUICK LOANS PETROSERVICIOS and personal accounts, would send payments to the various auction houses in the form of wire transfers, checks and personal checks to pay for the horses to give the appearance that the funds were coming from legitimate sources.

15.     Once the horses were purchased, ownership would be placed in various names and boarded at different ranches throughout the Southwest United States. NAYEN was identified as the person in charge of the debt payments for the boarding, breeding, and training of the horses. GARCIA acted on behalf of NAYEN in dealing with American businessmen. The

---

[1] On March 28, 2013, NAYEN entered into a plea agreement wherein he pled guilty to Conspiracy to Launder Monetary Instruments in violation of Title 18 U.S.C. § 1956(h) in criminal case number A-12-CR-210-SS and to Conspiracy to Possess with Intent to Distribute Five (5) kilograms or more of Cocaine in violation of Title 21 U.S.C. § 846 in criminal case number A-13-CR-92-SS. On May 9, 2013, GARCIA and COLORADO were found guilty by a jury of Conspiracy to Commit Money Laundering.

debts were paid by various members of the organization at the direction of NAYEN, GARCIA, and/or an individual by the name of VICTOR LOPEZ in various ways, such as by wire transfers from Mexico, bulk currency payments derived from the sale of cocaine, bulk currency deposited into bank accounts that were in part smuggled across the border with Mexico to avoid the Currency Monetary Instruments Report requirement, and structured currency deposits into bank accounts.

16.     NAYEN established Carmina LLC as a business to help facilitate the laundering of funds through the American Quarter Horse Industry. GARCIA established Garcia Bloodstock & Racing which helped facilitate the laundering of funds through the American Quarter Horse Industry. Other businesses such as Poker Ranch LLC, Desiree Princess Ranch LLC, Bonanza Racing Stables, and ADT were established and used in the laundering of the proceeds.

17.     Once a horse became profitable, either through the winnings of high stakes horse races sponsored by the American Quarter Horse Association (AQHA) or through the sale of breeding rights of successful race horses, ownership of the horses was then transferred, showing no or minimal purchase price, from the name of the front company or nominee to J.TREVINO or various companies that were established for his benefit, including Tremor Enterprises LLC, 66 Land LLC, and Zule Farms LLC. This enabled J.TREVINO to show large, apparently legitimate profits from minimal investments.

**C.     Specified Unlawful Activity:  Cocaine Distribution.**

18.     MARIO ALFONSO CUELLAR, a Confidential Informant (hereinafter "CI #1")[2], provided the following information, which has been corroborated by other witnesses, seizures, and documents:

---

[2] Mario Alfonso Cuellar testified at the money laundering conspiracy trial of J.TREVINO, CESSA and GARCIA in Austin, Texas in April 2013.

a. CI #1 met O.TREVINO in 2008 through an individual only known as "MOY." MOY was a *Zeta Comandante* in Piedras Negras, Coahuila, Mexico at that time with whom CI #1 was conducting drug distribution activities.  CI #1 also met JESUS ENRIQUE REJON AGUILAR, who was also known as MAMITO.

b. During this time, CI #1 owned a number of quarter horses and organized horse races in Mexico.

c. O.TREVINO wanted CI #1 to compete in a horse race against him.  They competed in a couple of races during a 4-month period, and O.TREVINO would always win because of CI #1's knowledge that O.TREVINO would get upset at a loss and most likely kill his opponent as a result.

d. CI #1 began to work for O.TREVINO.  O.TREVINO would give CI #1 200 kilograms of cocaine at a time.

e. CI #1 met M.TREVINO at HECTOR CHAPAS' stables, which were located between Nuevo Laredo and Piedras Negras.

f. CI #1 saw J.TREVINO approximately five times.

g. CI #1 identified NAYEN, who worked for EFRAIN TEODORO TORRES (also known as Z-Z 14) who was killed in a horse race in Veracruz.  NAYEN is from Veracruz.  Following TORRES' death, NAYEN became the right-hand man for M.TREVINO's quarter horse interests.

h. CESSA, a businessman from Veracruz, is like a step-father to NAYEN.  CI #1 met CESSA at a horse race in Coahuila.  CESSA owns a lot of horses, and he also coordinates horse races in Mexico.

19.    RAUL   GERARDO   GUADALAJARA-GUIA,   a   Confidential   Informant (hereinafter "CI #2")[3], provided the following information, which has been corroborated by other witnesses, seizures, and documents:

a. CI #2 met CI #1 around 1993 or 1994 in Nava, Coahuila, Mexico.  CI #2 began working for CI #1 trafficking in marijuana and eventually began trafficking cocaine.  CI #2 would escort narcotics loads to San Antonio, Texas and Houston, Texas.

---

[3] Raul Gerardo Guadalajara-Guia testified at the money laundering conspiracy trial of J.TREVINO, CESSA and GARCIA in Austin, Texas in April 2013.

b.  Around 2009, *LOS ZETAS* took control of Coahuila, Mexico.  CI #1 introduced CI #2 to MAMITO (*i.e.* JESUS ENRIQUE REJON AGUILAR), M.TREVINO, and O.TREVINO.

c.  In Nava, Mexico, CI #2 would stash and distribute marijuana and cocaine.  CI #2 would also count money derived from the sale of narcotics.  Every week, the organization received anywhere from 1.5 to 2 million dollars in United States currency.  The most CI #2 ever counted was five million dollars.  All the dollar bills would be inspected, and the bills with markings would be used to pay bribes to corrupt police officers and other associates.  After the money was counted, it would be placed inside ice chests with foam and locked.  M.TREVINO's accountant, only known as "CUNO," would take the ice chests to undisclosed locations.

d.  CI #2 saw CESSA at private horse races with M.TREVINO and other members of *LOS ZETAS.*

20.     HECTOR GERARDO MORENO-VILLANUEVA, a Confidential Informant (hereinafter "CI #3")[4], provided the following information, which has been corroborated by other witnesses, seizures, and documents:

a.  CI #3 began trafficking narcotics in Piedras Negras, Mexico in 2000, working for JESUS FERNANDEZ (hereinafter "FERNANDEZ").

b.  FERNANDEZ became O.TREVINO's father-in-law in 2007.  FERNANDEZ worked for CI #1 as well.

c.  CI #3 met O.TREVINO in 2007.  CI #1 organized rooster fights and horse races. O.TREVINO would attend.

d.  CI #3 met M.TREVINO in 2007 in Monclova, Mexico at a rooster fight.

e.  In 2007, CI #3 worked with FERNANDEZ under CI #1.  They would send kilograms of cocaine from Allende, Mexico to San Antonio, Texas and Austin, Texas every two weeks.

f.  CI #3 was responsible for arranging bulk currency pickups in Dallas, Texas; Houston, Texas; and Chicago, Illinois.  CI #3's main responsibility for M.TREVINO was the receiving and distribution of narcotics' proceeds once it arrived back in Mexico.  The bulk cash currency would be driven to either Piedras Negras, Mexico or Nava, Mexico. CI #3's job was to separate the currency into

---

[4] Hector Gerardo Moreno-Villanueva testified at the money laundering conspiracy trial of J.TREVINO, CESSA and GARCIA in Austin, Texas in April 2013.

denominations of 20 dollar bills, 50 dollar bills, and 100 dollar bills. "CUNO" was *LOS ZETAS*' accountant. CUNO was very picky about how CI #3's crew turned the money in. CI #3 had to remove any bills that had any type of markings or that appeared old and dilapidated. These "dirty" bills would be used in Mexico as bribe payments to various persons. The "clean" bills would be taken to *casa de cambios* (*i.e.* money exchange houses) in Mexico.

g. M.TREVINO sent money to the United States to buy horses. One of the horses purchased by M.TREVINO was a horse named Tempting Dash. This horse was originally in the name of RAMIRO VILLARREAL. Since the horse ran well, M.TREVINO wanted the registration on the horse changed to his brother, J.TREVINO, to maintain control.

h. M.TREVINO purchased many horses in the United States at both private and public auctions. M.TREVINO used NAYEN to purchase many of the horses. The money used to purchase the horses came from the sale of cocaine.

i. M.TREVINO through NAYEN used CESSA to pay for some of the horses that were purchased at auctions. M.TREVINO would provide the money to CESSA who would launder the money through his company, ADT, and then send the money into the United States to pay for the horses.

j. At the September 2010 Ruidoso Downs Horse Sale, CESSA spent the most money on the purchase for horses and received a trophy which was later given to M.TREVINO.

21.     JOSE CARLOS HINOJOSA (hereinafter "HINOJOSA") was interviewed on June 27, 2012. He testified at the money laundering conspiracy trial of J.TREVINO, CESSA and GARCIA in Austin, Texas in April 2013. HINOJOSA hopes to receive some reduction on his prison sentence with his cooperation with law enforcement. HINOJOSA provided the following information:

a. HINOJOSA was the accountant for EFRAIN TORRES aka Zeta 14 (hereinafter "TORRES") dating back to at least 2003 and continuing until TORRES was killed in 2007. TORRES was in charge of criminal activities for *LOS ZETAS* in Veracruz, Mexico.

b. HINOJOSA met CESSA through TORRES in approximately 2003 or 2004 in Veracruz, Mexico.

c. TORRES traveled to Veracruz, Mexico in approximately 2004 to establish control of Veracruz and the port. CESSA introduced TORRES to a politician named

12

HERRERA who was running for governor in Veracruz, Mexico. CESSA made the introduction between HERRERA and TORRES. TORRES began to provide drug proceeds through CESSA to HERRERA. TORRES provided approximately $12 million in drug proceeds as bribes to HERRERA.

d.   HERRERA was elected as governor.

e.   CESSA introduced TORRES to other drug dealers in Veracruz, Mexico. TORRES and CESSA became good friends. CESSA had a ranch in Mexico and some horses. TORRES and CESSA would meet at the ranch for visits.

f.   In approximately 2004 CESSA asked TORRES for $6 million to start some businesses. TORRES provided CESSA with $6 million in drug proceeds to start the businesses. HINOJOSA, as the accountant for TORRES, had the money sent to CESSA. HINOJOSA had to record this currency transaction. HINOJOSA stated that he recorded the transaction on his computer.

g.   CESSA used the money to buy equipment for his businesses.

h.   HINOJOSA stated that one of the businesses started with the drug proceeds was named either ADT PETROSERVICIOS or ADT PERFORECIONES. This business would enter into contracts with *PETROLEOS MEXICANOS* (aka *"PEMEX")*. The contracts between PEMEX and CESSA's business called for the clearing of land and assisting PEMEX in drilling for oil. TORRES and CESSA were partners since TORRES provided drug proceeds to get the business up and running.

i.   HINOJOSA could not recall the name of the second business started by CESSA with the drug proceeds. However, he knew that CESSA would enter into government contracts through his connections with HERRERA to build roads and get other state projects.

j.   HINOJOSA had to keep records of the payments and repayments between TORRES and CESSA because if CESSA did not repay the debt then all the items owned by CESSA would be taken over by TORRES (and *LOS ZETAS*).

k.   CESSA got into additional debt by gambling on horse racing. In approximately 2005 or 2006, CESSA asked TORRES for additional money. Since CESSA and TORRES were good friends, TORRES provided the additional money to CESSA. HINOJOSA had to record this transaction as the accountant for TORRES.

l.   CESSA could not repay his debt to TORRES. Because TORRES and CESSA were friends, and CESSA agreed to put his ranches up as collateral, TORRES allowed CESSA to join the drug business.

m.   HINOJOSA explained that if TORRES had 500 kilograms of cocaine come into

13

his area on a front.  This cocaine was to be moved and distributed.  TORRES allowed a portion, approximately 50 kilograms to be held under the control of CESSA.  The cocaine under the control of CESSA would be distributed in Mexico.

n.  HINOJOSA was in charge of the accounting and would account for all the drug proceeds that came back from the United States and from the distribution in Mexico.  When the money from the distribution of cocaine was gathered and counted, TORRES would let HINOJOSA know how much money was credited to the account of CESSA.  The profits credited to CESSA would be split.  Part of the profits would be applied to the debt that CESSA owed TORRES for the previous loans and part of the proceeds would be given to CESSA that he could use to pay other debts including his horse racing debts.

o.  TORRES and CESSA started using an aircraft belonging to CESSA to transport cocaine from Comitan, Chiapas, Mexico; Palenque, Mexico; and Acayucan, Veracruz, Mexico to Tuxpan, Veracruz, Mexico.

p.  CESSA was friends with a drug supplier called EL TIO (or the uncle) of Acayucan, Mexico.  CESSA introduced TORRES to EL TIO for the purpose of EL TIO supplying cocaine to TORRES.  EL TIO began to supply cocaine to TORRES.

q.  HINOJOSA believes that CESSA put some of the drug proceeds into his business bank accounts because CESSA would write checks to pay some of his debts.

r.  CESSA received checks from state contracts and from PEMEX.  Some of these checks would be deposited into the business bank accounts.  CESSA would then write checks to TORRES (thus assisting TORRES in the laundering of drug proceeds).

s.  TORRES mentioned to HINOJOSA that if CESSA failed to pay his debts, then the ranches would belong to TORRES (and *LOS ZETAS*).

t.  The relationship between TORRES and CESSA lasted until TORRES was killed at a horse race in 2007.

u.  In March 2007, after TORRES was killed, M.TREVINO and HERIBERTO LAZACANO LAZCANO (hereinafter "LAZCANO") had all the workers for TORRES meet with them in Tampico, Mexico.  There were about 100 workers present.  The meeting was to discuss who would take control of the criminal activities in Veracruz and to discuss who owed money to the organization.

v.  It was determined that M.TREVINO would take control and all the workers would resume their duties and report to M.TREVINO.  HINOJOSA had previously met M.TREVINO in Nuevo Laredo at meetings directed by

14

LAZCANO.

w.  M.TREVINO had his own accountant named SABRITAS.

x.  During the meeting held by M.TREVINO and LAZCANO, it was determined that CESSA owed money to the organization.  Shortly thereafter, M.TREVINO, "REX" LNU (an original Zeta member), and the accountant for M.TREVINO (SABRITAS) met with CESSA to discuss the debt.

y.  HINOJOSA had the debt records recorded on his computer.  He was instructed to transfer the debt information to the computer of M.TREVINO's accountant.

z.  HINOJOSA stated that CESSA then reported to M.TREVINO.

aa.  HINOJOSA stated that between 2004 and 2007, CESSA purchased horses on behalf of TORRES.  These horses were purchased in New Mexico, Oklahoma, and California.  TORRES told HINOJOSA that he would give currency to CESSA to pay for the horses.

**D.  Laundering Proceeds Through the Purchasing and Racing of Quarter Horses.**

22.  RAMIRO VILLARREAL joined the money laundering conspiracy when he agreed to assist *LOS ZETAS* in obtaining horses for the organization.  VILLARREAL purchased a number of American quarter horses at various auctions in Texas, Oklahoma, New Mexico, and California.  VILLARREAL provided bulk currency to a business in Mexico.  The business would then send the money through various banks and then wire the money to various auction houses to pay for the horses.

23.  NAYEN and ALEJANDRO BARRADAS joined the money laundering conspiracy when they began to assist *LOS ZETAS* in obtaining and caring for the horses.  GARCIA, VICTOR LOPEZ, and SERGIO RINCON also joined the money laundering conspiracy as they assisted in the acquisition and care of the horses.   J.TREVINO joined the money laundering conspiracy when he took control of horses belonging to and cared for by *LOS ZETAS*.

24.  One of the horses purchased by *LOS ZETAS* was Tempting Dash.  On December

14, 2008, law enforcement confirmed that Mueller Racing had sold a horse named Tempting Dash through the Schvaneveldt Ranch Auctions in California. RAMIRO VILLARREAL was listed as the buyer and paid $21,500 for the horse.

25.    On October 24, 2009, Tempting Dash won the Dash for Cash at Lone Star Park in Grand Prairie, Texas. RAMIRO VILLARREAL won a race purse of $178,078 because the horse was registered for the race under his name.

26.    On November 14, 2009, the AQHA received paperwork transferring the registration of Tempting Dash from VILLARREAL to J.TREVINO. The alleged date of transfer was September 29, 2009; however, witnesses have stated that the document was back-dated.

27.    On April 15, 2010, J.TREVINO transferred the registration for Tempting Dash to his business, Tremor Enterprises LLC.

28.    Regarding this aspect of the scheme, CI #1 provided the following information:

a.    M.TREVINO put J.TREVINO in the horse race business. J.TREVINO had race horses which were boarded, trained and bred in Austin, Texas. (Tempting Dash had been held at a ranch outside of Austin, Texas for the past several years.) O.TREVINO told CI #1 that J.TREVINO would have never imagined how much money he was going to make from the horse races.

b.    In 2008 or 2009, RAMIRO [GUAJARDO VILLARREAL] from Monterrey bought horses on behalf of M.TREVINO.

c.    The horses purchased by RAMIRO were paid from Mexican bank accounts owned by legitimate businessmen. The businessmen would wire the money to the U.S. to pay for the horses and then receive cash from M.TREVINO and O.TREVINO.

d.    One of the businessmen used by the organization was CESSA.

e.    RAMIRO purchased a horse named Tempting Dash for M.TREVINO and O.TREVINO. Tempting Dash was bought for $28,000.

f.    CI #1 was aware that J.TREVINO had a notary public backdate the ownership paperwork to show a change of ownership for Tempting Dash. In 2008 through late 2009, Tempting Dash was registered under the name of RAMIRO

VILLARREAL.   Tempting Dash ran in two races at Lone Star Park in Grand Prairie, Texas in October 2009 winning over $180,000.  Paperwork showing the change of ownership was sent to the AQHA on November 14, 2009.  The back-dated document showed that Tempting Dash was sold to J.TREVINO on September 29, 2009.

g.   RAMIRO was paid $50,000 as a bonus because his name was removed as the owner of one of the horses.

h.   CI #1 received all horse-related expense statements.  CI #1 would then call O.TREVINO and give him the total.  If the bill was too high, CI #1 had to talk directly to M.TREVINO.

i.   EUSEVIO "CHEVO" HUITRON always had 20 to 30 horses belonging to M.TREVINO at any given time.  CI #1 received instructions from M.TREVINO or O.TREVINO to pay HUITRON between $300,000 and $400,000 in currency for horse-related expenses.   Tempting Dash was boarded and trained by HUITRON in 2009 near Austin, Texas prior to Tempting Dash winning the Dash For Cash Futurity and the Texas Classic Futurity.

28.   Tyler Graham, a Confidential Informant (hereinafter "CI #7"), provided and testified to the following:

a.   CI #7 has met J.TREVINO, NAYEN, GARCIA, SERGIO RICON, VICTOR LOPEZ, and ALFONSO DEL RAYO MORA.

b.   In early 2010, Tempting Dash was boarded in Elgin, Texas.  It was discovered that he had a rare blood disease.

c.   J.TREVINO was told that the Texas Animal Health Commission would probably quarantine Tempting Dash.  J.TREVINO took the horse away from Southwest Stallion Station.

d.   Since TEMPTING DASH was diagnosed with a rare blood disease and quarantined, he could no longer race.  Therefore, Tempting Dash is now used as a stud horse to generate (launder) additional funds for the organization.

e.   In May 2010, Tempting Dash was bred to approximately 6 to 8 mares that belonged to the organization and held under the control of NAYEN.

f.   In early 2011, Tempting Dash was registered as a stud horse.  They charge $5,000 per breeding (semen sample) with Tempting Dash.

17

g. In 2011, Tempting Dash had approximately 130 breedings. Some of the breedings were given away in accordance with the industry practice of providing sperm to high-quality brood mares to hopefully increase the price of a breeding.

h. Tempting Dash was housed at Southwest Stallion Station and was used in excess of 100 breedings (*i.e.* taking sperm from the stallion and impregnating mares).

i. Members of the organization including CESSA, NAYEN, ALEJANDRO BARRADAS, ROGELIO MONTEMAYOR, and PEDRO ALCALA were billed for the breeding fees at $5,000 per breeding. NAYEN directed the payment of breeding fees for himself, CESSA, ALEJANDRO BARRADAS, ROGELIO MONTEMAYOR, and PEDRO ALCALA. CI#7 believed that many of these breedings were to horses that had the registration changed to 66 Land LLC in January 2012. 66 Land LLC is a company owned and controlled by J.TREVINO. This resulted in approximately $150,000 being paid to J.TREVINO for horses under his control.

29. The totality of the evidence shows that the breeding of Tempting Dash to horses under the control of J.TREVINO and NAYEN was a way to launder funds and provide a cash flow for J.TREVINO.

30. Another horse purchased by *LOS ZETAS* was Maverick Perry, who was renamed Mr Piloto by *LOS ZETAS*. Records obtained from Heritage Place shows that RAMIRO VILLARREAL, agent, purchased 18 horses for $430,800 during the September 17 – 19, 2009 Quarter Horse Yearling Sale in Oklahoma City, Oklahoma. Maverick Perry (later renamed Mr Piloto) was one of the horses purchased; the horse was bought for $81,000.

31. Records obtained from the AQHA provide a more detailed picture of the purchase and renaming of Maverick Perry. AQHA records show that Maverick Perry was purchased by RAMIRO VILLARREAL on September 17, 2009, for $81,000. The ownership of the horse was changed to Garcia Bloodstock & Racing, which is owned by GARCIA, on January 15, 2010. The name of Maverick Perry was then changed to Mr Piloto. GARCIA was an associate of NAYEN who helped him conduct various transactions.

32. Regarding this part of scheme, CI #1 provided the following information:

18

    a.  NAYEN convinced M.TREVINO that he could assist him in his horse racing endeavors. NAYEN eventually received the green light to pick horses on M.TREVINO's behalf at horse auctions.

    b.  M.TREVINO would show CI #1 which horses he bought as M.TREVINO received updates via text messages from NAYEN at auctions.

    c.  A horse named Mr Piloto was purchased by NAYEN for $100,000 to $200,000.

    d.  Mr Piloto qualified to run in a race with a $2 million purse at Ruidoso Downs racetrack in Ruidoso, New Mexico. M.TREVINO and NAYEN sent a bribe payment to Ruidoso, New Mexico to alter the outcome of the horse race.

    e.  The bribe payment was so that the gate crew would hold all of the horses, except for Mr Piloto, slightly longer when the gates opened, thus, giving Mr Piloto a head start.

33.    On August 19, 2010, Mr Piloto won the All American Quarter Horse Futurity Trial 15 in Ruidoso, New Mexico. Garcia Bloodstock & Racing was listed as the owner.

34.    On August 25, 2010, Yearsley Bloodstock Insurance was notified via email that MR PILOTO was insured under the name of Garcia Bloodstock & Racing c/o GARCIA. On August 27, 2010, Dr. Jeffrey Wheeler signed a Vet Certificate for Equine Mortality Insurance for Mr Piloto listing Garcia Bloodstock & Racing as the owner of the horse. On September 1, 2010, Yearsley Bloodstock Insurance was notified via email that Garcia Bloodstock & Racing had requested that the insurance on Mr Piloto be changed to Tremor Enterprises. On September 3, 2010, the AQHA received paperwork transferring the registration of Mr Piloto from Garcia Bloodstock & Racing to Tremor Enterprises LLC c/o J.TREVINO. The transfer paperwork sent to AQHA showed a transfer date of July 10, 2010 (*i.e.* before the All American Quarter Horse Futurity Trial 15 was held in August 2010).

35.    CI #7 provided the following information regarding Mr Piloto:

    a.  Mr Piloto was taken to Elgin, Texas in December 2010 to be used as a stud horse. A number of those breedings were to horses under the control of NAYEN. Two

or three of the horses were actually in the name of J.TREVINO, and three horses were under the name of CESSA.

    b. CI #7 identified a number of mares that were bred to Mr Piloto in 2011. In November and December 2011, many of these mares were moved to 66 Land LLC and Zule Farms LLC, which are owned by J.TREVINO. J.TREVINO then filed paperwork with the Oklahoma Bred Registry claiming ownership through 66 Land LLC on January 29, 2012.

    c. Mr Piloto was housed in Elgin, Texas and was used for breeding.

    d. The organization members paid for the breedings. Breedings were paid for by CESSA, NAYEN, LUIS GERARDO AGUIRRE, and ROGELIO MONTEMAYOR to horses that had the registration changed to 66 Land LLC in January 2012. This resulted in approximately $52,500 being paid to J.TREVINO for horses under his control.

36. The totality of the evidence shows that the breeding of Mr Piloto to horses under the control of J.TREVINO and NAYEN was a way to launder funds and provide a cash flow for J.TREVINO.

**E.    <u>Cessa's Role in the Purchase of Quarter Horses.</u>**

37. CESSA began to assist the organization in purchasing horses prior to TORRES' death in 2007 and continuing through early 2012. CESSA allowed *LOS ZETAS* to use his businesses. Information obtained by the FBI details a gun battle between Mexican Federal Police and members of *LOS ZETAS* in March 2012 which took place at CESSA's ranch. ENRIQUE DELGADO FRAIRE, a plaza boss for *LOS ZETAS*, was killed along with one other gunman. Seven other organization members were wounded.

38. Records obtained from the Ruidoso Horse Sales Company regarding the 2008 Select Quarter Horse Sale held on August 29, 2008, show that 13 horses were purchased under CESSA's name for $414,500. CESSA paid $397,250 with two checks drawn on the American Express Bank International account of MARIA EMMA SALMAN ROCHA (*i.e.* his wife) and FRANCISCO A. COLORADO C. There was an adjustment of $17,250 to make up the

difference.

39.     Records obtained from the Ruidoso Horse Sales Company for the Yearling Sale held on September 4, 2009, show that 13 horses were purchased under CESSA's name with the assistance of LUIS GERARDO AGUIRRE for a total of $546,500.  They paid $516,500 with a check drawn on the American Express Bank International account of MARIA EMMA SALMAN ROCHA and FRANCISCO A. COLORADO C and a $30,000 check drawn on The Laredo National Bank Houston account of CESSA and SERGIO COLORADO CESSA.  This purchase included quarter horses such as Morning Cartel for $57,000 (which was seized by law enforcement from J.TREVINO's ranch on June 12, 2012) and Feature Honor for $12,000 (which was later transferred to NAYEN's CARMINA LLC  and then to J.TREVINO or one of his companies and sold at an inflated price to members of LOS ZETAS).  Another horse purchased with the $516,500 check from CESSA was named One Famous Patriot (later renamed Tamaulipas Boy), which was purchased for $205,000 under the name of One Famous Patriot.

40.     During the Ruidoso Horse Sales Company's Yearling sale held on September 3 – 5, 2010, FBI agents conducted surveillance and observed the following:

a.  J.TREVINO, NAYEN, SERGIO RINCON, RENE RUIZ, RAUL RAMIREZ, JR. and others.  RENE RUIZ and RAUL RAMIREZ, JR. were bidding on some horses on behalf of NAYEN and J.TREVINO.  RUIZ and RAMIREZ were raising their hands for the bids while NAYEN was making telephone calls, photographing the horses, and apparently reporting the results.  After the bid was won, NAYEN would take pictures of the auction board with his cellphone that showed the purchase price and would forward it to an unknown third party.

b.  Records obtained from the Ruidoso Horse Sales Company show that RENE RUIZ, RAUL RAMIREZ, JR., SERGIO RINCON, and others bid on and purchased 23 horses, including Wild and Fast (later renamed Mi Flash) for $340,000; Dancin n the Rain (later renamed En la Lluvia) for $135,000; Fly First Down for $300,000; Walk Thru Moonfire (later renamed Mi Vengador) for $60,000; Dreamgirl Jess (later renamed Mi Babe) for $140,000; Night Jasmine (later renamed Juanita Mi Amor) for $200,000; and Too Tempting (later renamed Mi Pequena Amor) for $300,000.   The total price for all 23 horses was

$2,240,700. The manager of the Ruidoso Horse Sales Company was concerned with whether RENE RUIZ and RAUL RAMIREZ, JR. could actually buy the horses, considering how many horses they had bid on, the line of credit that they had racked up, and their relatively young age. RENE RUIZ and RAUL RAMIREZ, JR. said their money was good.

c. After the auction, CESSA provided a check for $2,240,700 drawn on BBVA Compass account of CESSA and SERGIO COLORADO CESSA to pay for the horses. As a result of the check from CESSA, he was listed on the auction paperwork as the owner.

d. After the auction, DIANE REED with the Ruidoso Sales Company stated that CESSA picked up the "high buyers trophy." This is the only trophy ever given out in the history of the Ruidoso Horse Sales. (The trophy was later presented to M.TREVINO.)

e. Subpoenaed records, including those from the AQHA, show that the ownership on a number of horses has been transferred to other organization members, including LUIS GERARDO AGUIRRE, SERGIO RINCON, J.TREVINO under the name of Tremor Enterprises LLC, ARMONDO CABRERA DE LA VEGA under the name of Desiree Princess Ranch LLC, CARLOS NAYEN under the name of Carminal LLC, and GARCIA under the name of Garcia Bloodstock & Racing LLC.

41.     An email from Nancy Yearsley to GARCIA dated September 12, 2010. stated that effective September 5, 2010, the yearlings were insured at the Ruidoso Sales per instructions from NAYEN and that the horses were in the names of different people who she did not believe were the true owners. Many of these horses were originally insured under Tremor Enterprises listing Garcia Bloodstock & Racing as a Loss Payee.

42.     The insurance documents were later changed from Tremor Enterprises to Garcia Bloodstock & Racing. On an insurance invoice dated November 12, 2010, Garcia Bloodstock & Racing c/o GARCIA was billed for insurance on several horses, and CESSA was listed as a "LOSS PAYEE" for seven of the horses.

43.     HERNANDO GUERRA, who established Fast and Furious, LLC, as a nominee company to acquire horses for J.TREVINO and other individuals, paid the insurance premiums

for these horses. These insurance premiums were paid with a $50,000 check from HERNANDO GUERRA dated January 18, 2011, a $25,000 wire transfer from HERNANDO GUERRA dated June 17, 2011, and a $8,090 wire transfer dated June 20, 2011.

44.     Records obtained from the Los Alamitos Equine Sales for October 2 – 3, 2010, show that SALVADOR BERRON, RAMIRO VILLARREAL, RACHUAN SUAREZ, and FELIPE QUINTERO bought hip #139 Aquaholic for $150,000; hip # 224 LA Walk Fire for $41,000; hip # 235 Travesty for $112,000; hip # 307 Moon Over Max for $62,000; and hip # 321 Unobetter for $77,000 in the name of Grupo Aduanero Integral Agencia ADU for approximately $442,000. Wire transfers from Grupo Aduanero Integral Agencia ADU were used to pay for the horses. FELIPE QUINTERO, acting as agent for Grupo Aduanero Integral Agencia ADU, transferred the horses to SALVADOR BERRON.

45.     Records obtained from Yearsley Insurance stated that Nancy Yearsley and other employees were at the Los Alamitos horse sale on October 2, 2010. The email stated that they needed to bind coverage on hip # 139 Aquaholic for $150,000 effective today's date for Tremor Enterprises. Another email stated that Tremor Enterprises just purchased another horse, i.e. hip # 235 Travesty for $112,000. Both horses were added to the insurance policy. CESSA was listed as an additional insured for Travesty even though the horse was purchased with funds from Grupo Aduanero Integral Agencia ADU.

46.     Records obtained from the Heritage Place sale on January 13, 2011, show that CESSA, GARCIA, MARCO BAEZ, LUIS GERARDO AGUIRRE, RIVER VIEW RANCH, EFREN GARCIA and ANTONIO SELEN assisted the organization in purchasing six horses including Dashing Little Reba and five embryos for $546,200. Some of these horses were transferred to J.TREVINO or one of his companies. Some of the money was wired from

GRUPO ADUANERO INTEGRAL AGENCIA ADU.

47.     On May 27, 2011, Fly First Down won the Ruidoso Quarter Horse Futurity Trial #11.  The horse's owner was listed as CESSA.  Fly First Down was originally purchased on September 3, 2010, at the Ruidoso Sale for $300,000.  On June 6, 2011, the registered owner of FLY FIRST DOWN was changed to Tremor Enterprises LLC.  This is one of several horses where ownership changed from the previous registered owner to J.TREVINO or his company Tremor Enterprises LLC after it qualified for a big race.

48.     During the execution of a Federal search warrant on J.TREVINO's residence and business in Lexington, Oklahoma on June 12, 2012, federal agents found the original Bank of America (BOA) Tremor Enterprises LLC check #1301 dated June 7, 2011, for $400,000 payable to CESSA for the stated purpose of "Purchase of Fly First Down."  The check was signed by ZULEMA TREVINO, *i.e.* J.TREVINO's wife.  The check was never negotiated and no other payment during that time period was discovered for the purchase of Fly First Down.

49.     Records obtained from Yearsley Insurance dated June 7, 2011, stated that Fly First Down was to be added to the insurance policy of Tremor Enterprises LLC for $400,000 as that was the purchase price.  Fly First Down died in December 2011, and the insurance company paid J.TREVINO $400,000 on January 4, 2012.  On March 21, 2012, J.TREVINO wrote BOA Tremor Enterprises LLC check #1628 payable to CESSA for  $50,000 for the stated purpose of "Purchase of Fly First Down."

50.     During the Heritage Place Yearling Auction on September 15, 2011, the organization purchased approximately 23 horses for $1,428,900.

      a.  At the Heritage Place Yearling Auction on September 15, 2011, FBI agents observed J.TREVINO, NAYEN, GARCIA, TOMAS GUAJARDO GARZA, and others.  It appeared to the agents that NAYEN was using unidentified persons to bid on the horses.

    b.   Records obtained from the Heritage Place Yearling Auction for September 15-17, 2011, show that 23 horses were purchased for $1,428,900. This purchase included Breakoutthebullets, Cartel Mischief, Eyesa Natova, Jessaraceaway, Last Loose Perry, Mr Perry Rose, and First Prize Moon. The horses were placed in various names to include CESSA, ANDRES GUITERREZ, JORGE OSTOS, Carmina LLC, ALEJANDRO REYES, RODRIGO NORZAGARAY, JORGE GONZALEZ, LUIS AGUIRRE, JOSE HERNANDEZ, ALEJANDRO FERNANDEZ, LUIZ GARZA, and LEOPOLDO RIANTO. The $1,428,900 was wired to Heritage Place by CESSA's ADT.

    c.   This purchase included First Prize Moon which was purchased under the name of RODRIGO NORZAGARAY for $435,000. AQHA records show that the horse was transferred to Bonanza Racing Stables LLC.

    d.   Bonanza Racing Stables LLC is under the name of FRANCISCO SILVA RAMOS and was incorporated on November 14, 2011. Records obtained from the AQHA show that FRANCISCO SILVA RAMOS authorized GARCIA to act on behalf of Bonanza Racing Stables LLC.

    e.   Records obtained from the AQHA show that at least seven of these horses were transferred to Bonanza Racing Stables LLC.

51.    Records obtained from Los Alamitos Sales Company show that during the sale of October 1 – 3, 2011, eight horses including Devine Cartel, Hot Hitting, Jess Bet on Me, Perry Famous, and Streak Hitter were purchased by CESSA, JOSE FAUSTINO ARANGO YNTRIAGO, RACHUAN SUAREZ, DEMEZ WIN, FELIPE QUINTERO, MARCO BAEZ, and JOSE RODRIGUEZ for $842,000. The horses were placed in the name of Bonanza Racing Stable LLC.

**F.**    **Laundering of Drug Proceeds Through the Care and Boarding of the Horses Purchased Above.**

52.    Regarding this part of the scheme, CI #3 provided the following information:

    a.   Money used to pay the horse expenses would come from the distribution of cocaine. The money would come to Piedras Negras, Mexico where it would be separated. Some of the drug proceeds would be given to NAYEN to pay for horse-related expenses. CI #3 would usually send between $150,000 to $300,000 at a time to NAYEN.

b. NAYEN had a worker known as "YOYO." NAYEN and YOYO would put money into money exchange houses in Nuevo Laredo, Mexico. NAYEN would then buy pesos, then convert the pesos back to dollars then wire the money to debtors in the United States.

c. CI #3 met J.TREVINO in Mexico. J.TREVINO came to meet with M.TREVINO and brought an Excel spreadsheet of expenses that needed to be paid for the horses. The meeting was attended by RAMIRO VILLARREAL, J.TREVINO, O.TREVINO, and NAYEN. The meeting took place in November 2010 after Mr Piloto won the All American Futurities. CI #1 used CI #3's computer to print the list, gave the list to CI #3, and asked CI #3 to give YOYO the currency to pay the expenses. YOYO is NAYEN's righthand man. The list totaled $1.8 million with an average of $200,000 per month of expenses accrued by TREVINO's horses. CI #3 sent the money he had received from cocaine sales to YOYO, and the bills were paid.

d. From September 2010 until March 2011, CI #3 separated or directed approximately $2 million to go towards M.TREVINO's quarter horse interests in the United States.

e. JOSE VASQUEZ, JR., a Confidential Informant (hereinafter "CI #6"), sent money to Lone Star Park in Grand Prairie, Texas two or three times in increments of $50,000 to $100,000 to associates of M.TREVINO.

f. Between September 2010 and March 2011,CI #3 sent money to NAYEN four times at Lone Star Park race track in Grand Prairie, Texas for a total of $250,000. Another trainer that the group used, EUSEVIO HUITRON, was sent $200,000 to purchase horses. VILLARREAL, who was the original horse purchaser at auctions for M.TREVINO, was sent $300,000 to pay for horses purchased at Ruidoso, Los Alamitos, and Oklahoma. (These are the three main sites of quarter horse auctions in the United States.). An additional $400,000 was sent to YOYO in Nuevo Laredo. The money sent to VILLARREAL was sent in a vehicle with a hidden compartment to Monterrey, Nuevo Leon, Mexico.

g. CI #3 knew some of the various straw companies used by M.TREVINO to race his horses, such as Garcia Caballos y Carreras, Tremor Enterprises, Fast & Furious LLC, Carmina, and S Quarteck. M.TREVINO bragged in front of CI #3 that the horse business was an easy way to launder money.

## G. **Funds Sent Through CESSA's Respondent Bank Accounts.**

53.     *LOS ZETAS* used CESSA and his business, ADT, to launder drug proceeds. A Witness testified at the trial in Austin, Texas in April and May 2013 that *LOS ZETAS* invested at least $6 million in drug money in ADT in 2004 and thereafter used ADT to launder its illegal

drug proceeds. In addition, the trial testimony indicated that CESSA's primary source of income was generated from ADT. More specifically, CESSA as the registered owner of ADT Petroservicios, would receive the illegal proceeds from the LOS ZETAS. Cessa sent funds into the United States to purchase horses at auctions and paid for horse related expenses by using personal accounts and the ADT Petroservicios accounts.

54.    On June 3, 2008, a personal account at BBVA Compass Bank account number XXXXXX5560 was established with CESSA and his brother, SERGIO COLORADO CESSA, as signatories. Between August 16 and November 4, 2010, this account received five wire transfers totaling $4,121,178.00 from ADT. On September 6, 2010, check #101 for $2,240,700.00 was made payable to Ruidoso Horse Sale Co. This check was used to purchase 23 horses at the Ruidoso horse auction. Check #101 is the first check written in this account which indicates it is a newly opened and funded account. This purchase is detailed in Paragraph 40c, above.

55.    Records obtained from USB AG show that CESSA and his wife (MARIA EMMA SALMON ROCHA) opened investment accounts at UBS AG. On December 6, 2009, they opened Respondent Bank Account XXXX1138 in their names. On November 5, 2010, they opened three additional bank accounts in the name of ADT. The Respondent Bank Accounts include XXXX4555, XXXX4565, and XXXX3021. The account documents list CESSA as the authorized officer and sole administrator of ADT. Bank Account XXXX3021 was opened as a Borrower Account with Respondent Bank Account XXXX1138 being the related Collateral Account. In other words, CESSA had to maintain funds in the Respondent Bank Account XXXX1138 so that he could use that account as collateral for any funds he borrowed through Bank Account XXXX3021.

56.     Respondent Bank Account XXXX1138 was primarily funded by wire transfers from ADT accounts at Banco Monex (account XXXXXX0805) and Banamex, both Mexican financial institutions. The balance of the account as of October 31, 2012, was $19,393,210.50. Since October 31, 2012, the balances in the account has increased due to interest.

57.     A financial analysis of ADT's financial statements was performed by IRS Special Agent Michael Fernald. The financial statements were provided to UBS AG and show that ADT did not have enough money to pay its expenses **and** purchase horses, thus, corroborating other witnesses who stated that *LOS ZETAS* used ADT and CESSA to launder their drug money.

58.     Respondent Bank Account XXXX3021 was also primarily funded by wire transfers from ADT in Mexico. By February 8, 2011, deposits into the account amounted to approximately $6 million. CESSA took out loans from this account which funded large wires to entities including ADT at Banco Monex in Mexico and Insured Aircraft Title Service Inc. at International Bank of Commerce (IBC) in Laredo. Said account currently consists of foreign money market position, also known as an equity position, which is denominated in pesos converted into United States currency equivalent to the amount of $860,348.44.

59.     Respondent Bank Account XXXX4555 was primarily funded by one transfer in the amount of $2 million from Bank Account XXXX3021on March 29, 2011. The balance of this account as of October 31, 2012, was $2,034,603.92. This transfer would not have been possible without the wire transfers into Respondent Bank Account XXXX1138 by ADT.

60.     Respondent Bank Account XXXX4565 was primarily funded by one transfer in the amount of $3 million from Bank Account XXXX3021 on March 29, 2011. The balance of this account as of October 31, 2012, was $3,185,693.42. This transfer would not have been possible without the wire transfers into Respondent Bank Account XXXX1138 by ADT.

61.     A summary of the funds remaining in the Respondent Bank Accounts held at UBS as of August 29, 2013, is as follows:

| Name of Account Holder(s) | Account No. | Market Value as of 8/28/13 |
|---|---|---|
| ADT Petroservicios S.A. de C.V. | XXXX3021 | $860,348.44 |
| ADT Petroservicios S.A. de C.V. | XXXX4555 | $2,031,001.19 |
| ADT Petroservicios S.A. de C.V. | XXXX4565 | $3,105,265.82 |
| Maria Emma Salman Rocha and Francisco Antonio Colorado Cessa | XXXX1138 | $19,178,959.99 |
| **TOTAL** | | **$25,175,575.44** |

**Note that the account balances have since been affected by interest.

## H.     Aircraft Owned by Cessa.

62.     On or about June 2012, the United States Office of Foreign Asset Control (OFAC) listed CESSA as a Specially Designated Narcotics Trafficker under the Foreign Narcotics Kingpin Designation Act ("the Act"). The Act prohibits United States persons from conducting financial or commercial transactions with any designated individual.

63.     Two aircraft were identified as being purchased by CESSA and/or through his business, ADT. The Respondent Aircrafts are a 2005 Raytheon Hawker 800XPi with registration number N824LX and serial number 258740 and a 2005 Beechcraft King Air B200 with registration number XA-RDJ (Mexico) and serial number BB1907. The Respondent Aircrafts are located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (*i.e.* Houston Hobby Airport).

64.     During June 2012, individuals at Hawker-Beechcraft Services-Houston and David Gerger (Gerger), an attorney, were informed that the two previously mentioned aircraft were blocked assets and could not be removed from the airport without the proper documentation from OFAC. Gerger responded by sending a letter dated June 25, 2012, to OFAC-Compliance

Programs Division indicating that he represented AirCrew Solutions, LLC (a Delaware company) and Redwings SA de CV (a Mexican company) relating to the previously mentioned blocked aircraft. In the letter, Gerger provided information relating to the purchase of each aircraft.

65.     The Respondent Aircraft 2005 Raytheon Hawker 800XPi, N824LX, was purchased by Cruz Aviation Services, LLC on behalf of ADT. The plane was then registered to Aircrew Solutions, LLC, an affiliate of Cruz Aviation Services, LLC. ADT has fully paid for the aircraft, but the documentation transferring the registration of the aircraft to ADT had not been filed prior to CESSA being added to the OFAC list.

66.     The Respondent Aircraft 2005 King Air B200, XA-RDJ was purchased by CESSA but is registered to Redwings SA de CV, who operates the aircraft under a contract with CESSA.

67.     On or about June 25, 2012, Gerger was interviewed by Special Agents. During this interview, Gerger explained that his clients (AirCrew Solutions, LLC and Redwings SA de CV) are acting as a broker/manager for the two previously mentioned aircraft that are owned by CESSA through a company identified as ADT. Gerger provided the sales documents relating to the Respondent Aircraft 2005 Raytheon Hawker 800XPi, N824LX. These documents included the Purchase Agreement and the Bill of Sale which identified the buyer as ADT. Gerger also provided the sales documents relating to the Respondent Aircraft 2005 King Air B200, XA-RDJ. These documents included the Bill of Sale dated October 24, 2011, and identified the buyer as CESSA.

***The Purchase of the Respondent Aircraft 2005 Raytheon Hawker XPi.***

68.    On or about December 1, 2011, Victor Cruz, owner of Cruz Aviation Services, LLC, entered into an agreement to purchase the Respondent Aircraft 2005 Raytheon Aircraft Company Hawker 800XPi with registration number N824LX and Serial Number 258740. According to the records of Insured Aircraft Title Service Inc., Cruz Aviation Services, LLC purchased the Respondent Aircraft from Flight Options, LLC for $4,500,000.  There was also an added escrow fee of $1,870.00 for a total price of $4,501,870.  As previously mentioned, this aircraft was purchased by Cruz Aviation Services, LLC on behalf of ADT, a company owned by CESSA.

69.    The payments for the aircraft consisted of wire transfers to the IBC account of Insured Aircraft Title Service Inc. from three sources.  The following chart summarizes these payments:

| Date | Amount | Source | Bank |
|---|---|---|---|
| November 23, 2011 | $100,000.00 | Cruz Aviation Services, LLC* | BOA |
| December 16, 2011 | $2,300,000.00 | ADT Petroservicios SA de CV | UBS AG |
| January 13, 2012 | $1,000,000.00 | ADT Petroservicios SA de CV | UBS AG |
| January 26, 2012 | $400,000.00 | ADT Petroservicios SA de CV | UBS AG |
| January 27, 2012 | $200,000.00 | Cruz Aviation Services, LLC* | BOA |
| January 30, 2012 | $150,000.00 | ADT Petroservicios SA de CV | BancoMonex |
| January 30, 2012 | $250,000.00 | ADT Petroservicios SA de CV | BancoMonex |
| January 31, 2012 | $1,870.00 | Cruz Aviation Services, LLC* | BOA |
| January 31, 2012 | $100,000.00 | Bernardo E. Moreno, President, Aircrew Solutions, LLC | JPM Chase |
| Total Payments: | $4,501,870.00 | | |

*As previously mentioned Cruz Aviation, LLC is affiliated with Aircrew Solutions, LLC.

70.     The funds provided by ADT were drawn from an ADT account (Bank Account XXXX3021) at UBS AG in Miami, Florida and an account at Banco Monex, S.A., a financial institution based in Mexico. The monies drawn from UBS AG Bank Account XXXX3021 were funded by loans from UBS AG.  As previously mentioned, Respondent Bank Account XXXX3021 is a Borrower Account and lists Respondent Bank Account XXXX1138 as the related Collateral Account, *i.e.* the loans were collateralized by funds on deposit in Respondent Bank Account XXXX1138 in the names of CESSA and his wife. Thus, the loan funds would not have been available if not for the funds on deposit from ADT in Respondent Bank Account XXXX1138.

71.     The funds provided by Cruz Aviation Services, LLC on November 23, 2011, amounting to $100,000, originated from the account of Aircrew Solutions LLC at BOA.  On January 12, 2012, a wire transfer in the amount of $100,000 was sent from Respondent Bank Account XXXX3021 in the name of ADT to the account of Aircrew Solutions, LLC at BOA. This possibly indicates a repayment of the $100,000 to Cruz Aviation Services, LLC by ADT.

### The Purchase of a the Respondent Aircraft 2005 Beechcraft King Air B200

72.     According to the records of Raytheon Aircraft Company (RAC), on or about December 5, 2005, Aerolineas Ejecutivas SA de CV entered into a lease/purchase agreement relating to Respondent Aircraft Beechcraft King Air B200, serial number BB-1907 from Raytheon Aircraft Credit Corporation (RACC). The records indicate that Cessa was the Grantor on the agreement. The records relating to the sale indicate a down payment of $3,000,000 was made.  However, due to corporate reorganizations, RAC employees were not able to locate the financial records that detail this payment.

73.     The Lease included a promissory note in which Aerolineas Ejecutivas SA de CV agreed to pay RACC $1,766,500 with 60 monthly installments of approximately $35,490.00. The termination date of this lease is listed as June 28, 2011.  Since CESSA was the Grantor of the agreement, the terms of the lease contained an Options Agreement which allowed CESSA the option of purchasing the aircraft at a specified price.  The Option Agreement expired on October 24, 2011.

74.     On or about September 26, 2006, the ownership and leasing rights of this aircraft were transferred from RACC to Raytheon Aircraft Receivables Corporation (RARC).  This ownership change had basically no effect on the lease terms of the Respondent Aircraft Beechcraft King Air B200.

75.     The transaction summary of this agreement contains the following narrative: "Mr. Francisco A. Colorado Cessa is the president and owner of ADT Petroservicios SA de CV ("ADT").  ADT began operations in May of 2001 and is based in Tuxpan, Veracruz, Mexico. The company derives all of its income from contracts with PEMEX for oil-related clean up, including area clean up, environmental contamination, drilling and exploitation of wells, and urbanization.  In order to manage ADT's various projects, Mr. Colorado requires the use of a King Air B200.  He has requested that ALE (Aerolineas Ejecutivas SA de CV), lease, manage and operate the Aircraft for his company's use.  Mr. Colorado has agreed to act as Guarantor for this transaction, but has declined to provide a personal financial statement."

76.     The monthly payments were made on this lease as specified in the contract.  The total amount of lease payments amounted to approximately $1,333,827.31.  When the aircraft (Purchase) Option Agreement expired on October 24, 2011, the ownership of the Respondent Aircraft Beechcraft King Air B200 was transferred to CESSA.  The records provided by David

Gerger contained an Aircraft Bill of Sale dated October 24, 2011 relating to "Aircraft BB-1907". The Bill of Sale identifies the aircraft owner (seller) as Raytheon Aircraft Receivables Corporation (RARC) and the buyer as CESSA. The Bill of Sale further describes the Respondent Aircraft Beechcraft King Air B200 bearing serial number BB-1907 with Mexican Registration Marking XA-RDJ.

77. Therefore, the totality of the facts surrounding how CESSA gained ownership of the Respondent Aircraft Beechcraft King Air indicates that he, rather than Aerolineas Ejecutivas SA de CV, paid for the aircraft and that CESSA used Aerolineas Ejecutivas SA de CV as a conduit to make the payments. The following is a summary of some of these aforementioned payments made by ADT to Aerolineas Ejecutivas SA de CV:

| Date | Amount | Payment Type | Source |
|------|--------|--------------|--------|
| 03/26/2007 | $104,000.00 | Check #101 | AMEX Bank Client Portfolio #104856-1 |
| 09/22/2010 | $16,498.64 | Wire Transfer | ADT Banco Monex account #XXX0805 |
| 11/26/2010 | $33,703.00 | Wire Transfer | ADT Banco Monex account#XXX0805 |
| 12/23/2010 | $44,319.87 | Wire Transfer | ADT Banco Monex account #XXX0805 |
| 01/27/2011 | $50,702.02 | Wire Transfer | ADT Banco Monex account #XXX0805 |
| 02/24/2011 | $51,499.88 | Wire Transfer | ADT Banco Monex account #XXX0805 |
| 03/25/2011 | $48,009.99 | Wire Transfer | ADT Banco Monex account #XXX0805 |
| 06/09/2011 | $33,738.10 | Wire Transfer | ADT Banco Monex account #XXX0805 |
| 10/12/2011 | $ 6,070.43 | Wire Transfer | ADT Banco Monex account #XXX0805 |

## I. **Conclusion.**

The collective evidence shows that ADT was involved in the Zeta money laundering scheme in violation of Title 18 U.S.C. § 1956(h) and therefore all assets of ADT, to include the Respondent Bank Accounts and Respondent Aircrafts, are subject to forfeiture pursuant to Title 18 U.S.C. §§ 981 (a) (1)(A) and 981(a)(1)(C). In addition, the evidence also shows that drug

proceeds from the Zeta Drug Trafficking Organization were used to substantially fund ADT on or about 2004 in violation of Title 21 U.S.C. § 841 and therefore all assets of ADT are subject to forfeiture, to include the Respondent Bank Accounts and Respondent Aircrafts, pursuant to Title 21 U.S.C. § 881 (a)(6).

In addition, the collective evidence shows that the Respondent Bank Accounts and Respondent Aircrafts represent properties involved in transactions or attempted transactions in violation of Title 18 U.S.C. § 1956 and 1957 or traceable to such property and are subject to forfeiture to the United States pursuant to Title 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and/or constitute or derive from proceeds traceable to violations of Title 18 U.S.C. § 1956, or a conspiracy to commit such offenses including violations of Title 21 U.S.C. § 841, and subject to forfeiture to the United States pursuant to Title 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and Title 21 U.S.C § 881 (a)(6).

## V. **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Petitioner United States of America prays that (1) due process issue to enforce the forfeiture of the Respondent Bank Accounts and Respondent Aircrafts, (2) due notice pursuant to Rule G(4) be given to all interested parties to appear and show cause why forfeiture should not be decreed[5], (3) an order to command the Internal Revenue Service, United States Marshals Service, or their designated agent, to post the Notice of Complaint for Forfeiture in accordance with Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Fed. R. Civ. P., and 18 U.S.C. § 985(c)(1)(B), (4) the Respondent Bank Accounts and Respondent Aircrafts be forfeited to the

---

[5] Appendix A, which is being filed along with this complaint, will be sent to those known to the United States to have an interest in the Respondent Horses.

United States of America, (5) the Respondent Bank Accounts and Respondent Aircrafts be disposed of in accordance with the law, and (6) for any such further relief as this Honorable Court deems just and proper.

Respectfully submitted,

ROBERT PITMAN
United States Attorney

By: _____
DIANA CRUZ-ZAPATA
Texas Bar No. 05196800
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel:  (210) 384-7040
Fax: (210) 384-7045

DANIEL M. CASTILLO
Texas Bar No. 00793481
816 Congress Ave., Suite 1000
Austin, Texas 78701
Tel:  (512)916-5858
Fax: (512)916-5854

Attorneys for United States of America

## **VERIFICATION**

Special Agent Steve Pennington declares and says that:

      1.      I am a Special Agent with the Internal Revenue Service, assigned to the San Antonio Field Office, and am the investigator responsible for the accuracy of the information provided in this litigation.

      2.      I have read the above Verified Complaint for Forfeiture and know the contents thereof; the information contained in the Verified Complaint for Forfeiture has been furnished by official government sources; and based upon information and belief, the allegations contained in the Verified Complaint for Forfeiture are true.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23RD day of August, 2013.

                                             Steve Pennington, Special Agent
                                           Internal Revenue Service
                                         San Antonio Field Office

Subscribed and sworn to before me on this the 23rd day of August, 2013.

                                           Notary Public in and for the State of Texas

DENISE AMY LOVE
Notary Public, State of Texas
My Commission Expires
October 12, 2013

My Commission Expires: 10/12/13

**APPENDIX A**

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>               Petitioner,<br><br>V.<br><br><br>ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX1138,<br><br>ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX3021,<br><br>ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX4555,<br><br>ANY AND ALL FUNDS IN UBS AG,<br>ACCOUNT NUMBER XXXX4565,<br><br>2005 RAYTHEON AIRCRAFT<br>COMPANY HAWKER 800XPi<br>REGISTRATION NO. N824LX<br>SERIAL NO. 258740, AND THE<br>RECORDS RELATED THERETO,<br>INCLUDING BUT NOT LIMITED TO:<br>AIRFRAME AND POWER PLANT<br>APPLIANCE  RECORDS, CURRENT<br>AIRCRAFT INSPECTION STATUS<br>RECORDS, HISTORICAL AIRCRAFT<br>MAINTENANCE RECORDS AND<br>ALL AIRCRAFT LOG BOOKS,<br><br>2005 RAYTHEON AIRCRAFT<br>COMPANY BEECHCRAFT<br>KING AIR B200, REGISTRATION NO.<br>XA-RDJ; SERIAL NO. BB-1907, AND<br>THE RECORDS  RELATED THERETO,<br>INCLUDING BUT NOT LIMITED TO:<br>AIRFRAME AND POWER PLANT | CIVIL ACTION NO.  A-13-CV-761 |

The right column contains closing parentheses ")" aligned with the rows of the caption.

1

APPLIANCE RECORDS, CURRENT           )
AIRCRAFT INSPECTION STATUS           )
RECORDS, HISTORICAL AIRCRAFT         )
MAINTENANCE RECORDS AND              )
ALL AIRCRAFT LOG BOOKS,              )
                                     )
    Respondents.           )

## NOTICE OF COMPLAINT FOR FORFEITURE

1. On _____, a Verified Complaint for Forfeiture was filed in this Court by the

United States Attorney for the Western District of Texas and Assistant United States Attorneys,

Diana Cruz-Zapata and Daniel M. Castillo, against the below described properties, more

particularly described in the Verified Complaint for Forfeiture, for violations of Title 18 U.S.C.

§§ 1956, 1957 and Title 21 U.S.C. § 841, and subject to forfeiture to the United States of

America pursuant to Title 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) and Title 21 U.S.C. §

881(a)(6):

  Any and all funds in UBS AG, Account Number XXXX1138 in the name of Francisco
  Colorado Cessa and his wife, Maria Emma Salmon Rocha;

  Any and all funds in UBS AG, Account Number XXXX3021 in the name of ADT
  Petroservicios SA de CV;

  Any and all funds in UBS AG, Account Number XXXX4555 in the name of ADT
  Petroservicios SA de CV;

  Any and all funds in UBS AG, Account Number XXXX4565 in the name of ADT
  Petroservicios SA de CV;

  2005 Raytheon Aircraft Company Hawker 800XPi; Registration Number N8224LX;
  Serial Number 258740, and the records related thereto, to include but not limited to:
  airframe and power plant appliance records, current aircraft inspection status records,
  historical aircraft maintenance records and all aircraft log books, located at Hawker-
  Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston
  Hobby Airport); and,

  2005 Raytheon Aircraft Company Beechcraft King Air B200; Registration Number XA-
  RDJ; Serial Number BB-1907, and the records related thereto, to include but not limited
  to: airframe and power plant appliance records, current aircraft inspection status records,

historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport),

hereinafter "Respondent Bank Accounts and Respondent Aircrafts."

2.    Pursuant to Supplemental Rule G(4)(b) notice to any person who reasonably appears to be a potential claimant shall be by direct notice. Accompanying this notice is the Verified Complaint for Forfeiture which has been filed in this cause and which describes the Respondent Bank Accounts and Respondent Aircrafts. Pursuant to Supplemental Rule G(4)(b) any person claiming an interest in the Respondent Bank Accounts and Respondent Aircrafts who has received direct notice of this forfeiture action must file a Claim in compliance with Rule G(5)(a), with the court within thirty-five (35) days after the notice was sent, if delivered by mail (if mailed, the date sent is provided below), or within 35 days of the date of delivery, if notice was personally served.  An Answer or motion under Rule 12 of the Federal Rules of Civil Procedure must then be filed within twenty-one (21) days of the Claim being filed.

The Claim and Answer must be filed with the Clerk of the Court, 200 W. 8th Street, Room 130, Austin, Texas 78701, and copies of each must be served upon Assistant United States Attorney Diana Cruz-Zapata, 601 NW Loop 410, Ste. 600, San Antonio, Texas 78216, or Daniel M. Castillo, 816 Congress Avenue, Suite 1000, Austin, Texas 78701, default and forfeiture will be ordered.  *See* Title 18 U.S.C. § 983(a)(4)(A) and Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claim and Asset Forfeiture Actions.

Failure to follow the requirements set forth above will result in a judgment by default taken against you for the relief demanded in the complaint.

DATE NOTICE SENT:_____

3

Respectfully submitted,

ROBERT PITMAN
United States Attorney

By: _____

DIANA CRUZ-ZAPATA
Texas Bar No. 05196800
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel:  (210) 384-7040
Fax: (210) 384-7045

DANIEL M. CASTILLO
Texas Bar No. 00793481
816 Congress Ave., Suite 1000
Austin, Texas 78701
Tel:  (512)916-5858
Fax: (512)916-5854

Attorneys for United States of America

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO. A-13-CV-761 |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX1138, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX3021 | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX4555, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX4565, | ) | |
| | ) | |
| 2005 RAYTHEON AIRCRAFT | ) | |
| COMPANY HAWKER 800XPi | ) | |
| REGISTRATION NO. N824LX | ) | |
| SERIAL NO. 258740, AND THE | ) | |
| RECORDS RELATED THERETO, | ) | |
| INCLUDING BUT NOT LIMITED TO: | ) | |
| AIRFRAME AND POWER PLANT | ) | |
| APPLIANCE  RECORDS, CURRENT | ) | |
| AIRCRAFT INSPECTION STATUS | ) | |
| RECORDS, HISTORICAL AIRCRAFT | ) | |
| MAINTENANCE RECORDS AND | ) | |
| ALL AIRCRAFT LOG BOOKS, | ) | |
| | ) | |
| 2005 RAYTHEON AIRCRAFT | ) | |
| COMPANY BEECHCRAFT | ) | |
| KING AIR B200, REGISTRATION NO. | ) | |
| XA-RDJ; SERIAL NO. BB-1907, AND | ) | |
| THE RECORDS  RELATED THERETO, | ) | |
| INCLUDING BUT NOT LIMITED TO: | ) | |
| AIRFRAME AND POWER PLANT | ) | |

1

APPLIANCE RECORDS, CURRENT      )
AIRCRAFT INSPECTION STATUS     )
RECORDS, HISTORICAL AIRCRAFT   )
MAINTENANCE RECORDS AND       )
ALL AIRCRAFT LOG BOOKS          )
                                      )
           **Respondents.**       )

## WARRANT FOR THE ARREST OF PROPERTY

**TO THE INTERNAL REVENUE SERVICE, UNITED STATES MARSHALS SERVICE, OR THEIR DESIGNATED AGENT, OR OTHER AUTHORIZED LAW ENFORCEMENT OFFICER OR ANY OTHER PERSON OR ORGANIZATION AUTHORIZED BY LAW TO ENFORCE THE WARRANT:**

WHEREAS a Verified Complaint for Forfeiture *in rem* was filed on _____,

against the following properties:

Any and all funds in UBS AG, Account Number XXXX1138 in the name of Francisco Colorado Cessa and his wife, Maria Emma Salmon Rocha;

Any and all funds in UBS AG, Account Number XXXX3021 in the name of ADT Petroservicios SA de CV;

Any and all funds in UBS AG, Account Number XXXX4555 in the name of ADT Petroservicios SA de CV;

Any and all funds in UBS AG, Account Number XXXX4565 in the name of ADT Petroservicios SA de CV;

2005 Raytheon Aircraft Company Hawker 800XPi; Registration Number N8224LX; Serial Number 258740, and the records related thereto, to include but not limited to: airframe and power plant appliance records, current aircraft inspection status records, historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport); and,

2005 Raytheon Aircraft Company Beechcraft King Air B200; Registration Number XA-RDJ; Serial Number BB-1907, and the records related thereto, to include but not limited to: airframe and power plant appliance records, current aircraft inspection status records, historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport),

(hereinafter "Respondent Bank Accounts and Respondent Aircrafts") alleging that the Respondent Bank Accounts and Respondent Aircrafts are subject to forfeiture to the United States of America pursuant to Title 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and Title 21 U.S.C. § 881(a)(6), for violations of Title 18  U.S.C. §§ 1956 and 1957 and Title 21 U.S.C. § 841.

WHEREAS an Order has been entered by the United States District Court for the Western District of Texas that a Warrant for Arrest of Property be issued as prayed for by Petitioner United States of America,

YOU ARE THEREFORE COMMANDED to arrest and take actual or constructive possession of Respondent Bank Accounts and Respondent Aircrafts as soon as practicable by serving a copy of this warrant on the custodian in whose possession, custody or control the Respondent Bank Accounts and Respondent Aircrafts are presently found, and to use whatever means may be appropriate to protect and maintain the Respondent Bank Accounts and Respondent Aircrafts in your custody until further order of this Court, including designating a substitute custodian or representative for the purposes of maintaining the care and custody of the Respondent Bank Accounts and Respondent Aircrafts and to make a return as provided by law.

SIGNED this _____ day of _____, 2013.


_____
WILLIAM G. PUTNICKI
United States District Clerk
Western District of Texas


By:     _____
        Deputy


3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO. A-13-CV-761 |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX1138, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX3021, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX4555, | ) | |
| | ) | |
| ANY AND ALL FUNDS IN UBS AG, | ) | |
| ACCOUNT NUMBER XXXX4565, | ) | |
| | ) | |
| 2005 RAYTHEON AIRCRAFT | ) | |
| COMPANY HAWKER 800XPi | ) | |
| REGISTRATION NO. N824LX | ) | |
| SERIAL NO. 258740, AND THE | ) | |
| RECORDS RELATED THERETO, | ) | |
| INCLUDING BUT NOT LIMITED TO: | ) | |
| AIRFRAME AND POWER PLANT | ) | |
| APPLIANCE  RECORDS, CURRENT | ) | |
| AIRCRAFT INSPECTION STATUS | ) | |
| RECORDS, HISTORICAL AIRCRAFT | ) | |
| MAINTENANCE RECORDS AND | ) | |
| ALL AIRCRAFT LOG BOOKS, | ) | |
| | ) | |
| 2005 RAYTHEON AIRCRAFT | ) | |
| COMPANY BEECHCRAFT | ) | |
| KING AIR B200, REGISTRATION NO. | ) | |
| XA-RDJ; SERIAL NO. BB-1907, AND | ) | |
| THE RECORDS  RELATED THERETO, | ) | |
| INCLUDING BUT NOT LIMITED TO: | ) | |
| AIRFRAME AND POWER PLANT | ) | |
| APPLIANCE  RECORDS, CURRENT | ) | |

1

AIRCRAFT INSPECTION STATUS        )
RECORDS, HISTORICAL AIRCRAFT      )
MAINTENANCE RECORDS AND           )
ALL AIRCRAFT LOG BOOKS            )
                                  )
       **Respondents.**        )

## <u>ORDER FOR WARRANT OF ARREST OF PROPERTY</u>

WHEREAS a Verified Complaint for Forfeiture *in rem* was filed on

_____, against the following properties:

Any and all funds in UBS AG, Account Number XXXX1138 in the name of Francisco Colorado Cessa and his wife, Maria Emma Salmon Rocha;

Any and all funds in UBS AG, Account Number XXXX3021 in the name of ADT Petroservicios SA de CV;

Any and all funds in UBS AG, Account Number XXXX4555 in the name of ADT Petroservicios SA de CV;

Any and all funds in UBS AG, Account Number XXXX4565 in the name of ADT Petroservicios SA de CV;

2005 Raytheon Aircraft Company Hawker 800XPi; Registration Number N8224LX; Serial Number 258740, and the records related thereto, to include but not limited to: airframe and power plant appliance records, current aircraft inspection status records, historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport); and,

2005 Raytheon Aircraft Company Beechcraft King Air B200; Registration Number XA-RDJ; Serial Number BB-1907, and the records related thereto, to include but not limited to: airframe and power plant appliance records, current aircraft inspection status records, historical aircraft maintenance records and all aircraft log books, located at Hawker-Beechcraft Services-Houston, 8401 Nelms Street, Houston, Texas 77061 (Houston Hobby Airport),

(hereinafter referred to as the "Respondent Bank Accounts and Respondent Aircrafts") alleging

that the Respondent Bank Accounts and Respondent Aircrafts are subject to forfeiture to the

United States of America pursuant to Title 18 U.S.C. §§ 981 (a)(1)(A) and 981(a)(1)(C) and Title 21 U.S.C. § 881(a)(6), for violations of Title 18 U.S.C. §§ 1956 and 1957 and Title 21 U.S.C. § 841; IT IS THEREFORE

ORDERED that a Warrant for Arrest of Respondent Bank Accounts and Respondent Aircrafts issue as prayed for, and that the Internal Revenue Service, United States Marshals Service, or their designated agent, for the Western District of Texas, or any other law enforcement officer, or any other person or organization authorized by law to enforce the warrant, be commanded to arrest the Respondent Bank Accounts and Respondent Aircrafts and to take actual or constructive possession for safe custody as provided by Rule G, Supplemental Rules of Federal Rules of Civil Procedure until further order of the Court, and to use whatever means may be appropriate to protect and maintain the Respondent Bank Accounts and Respondent Aircrafts while in custody, including designating a substitute custodian or representative for the purposes of maintaining the care and custody of the Respondent Bank Accounts and Respondent Aircrafts and to make a return as provided by law.

SIGNED this _____ day of _____, 2013.

_____
UNITED STATES DISTRICT JUDGE

3